IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PETER A. TAYLOR,

    Petitioner,               No. CIV-S-04-0981 LKK KJM P

    vs.

TOM L. CAREY,

    Respondent.            FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with an application for writ of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges the fact that he was denied parole in 2001.

I. Background

        In 1989, petitioner was convicted in the Superior Court of San Francisco County of several offenses, including aggravated mayhem, and sentenced to life imprisonment with the possibility of parole. Answer, Ex. 1. Petitioner challenged his convictions and sentences to the

/////
/////
/////
/////

1

California Court of Appeal. The Court of Appeal summarized the facts presented at trial as follows:

> On January 14, 1989, at 9.p.m., Officers John Miller and Michael Paganini, dressed in plain clothes and driving an unmarked car, were at the intersection of Capp and 24th Streets in San Francisco when they heard two gunshots coming from the direction of a white Buick. Just prior to hearing the gunshots, Officer Paganini observed that the Buick was stopped in the traffic lane "kitty corner" to Capp and 24th Streets. He testified the passenger in the car was leaning out the front window. After hearing the gunshots, the officers saw that the passenger, Taylor, who had stretched his torso out of the passenger window, was moving back inside the car. The Buick then drove off quickly.
>
> Anthony Vicenti testified that the victim, William Guardado, and he were drinking outside the liquor store at Capp and 24th Streets when Guardado was shot. Vicenti admitted that he had consumed a 12-pack of beer earlier that day and some PCP, and was drunk at the time. He recalled that a few minutes before the shooting Guardado was arguing with two Black men in a white car. He did not remember the subject of the argument. Guardado approached the car and was screaming at the two men. The white car drove off but returned five to ten minutes later. Vicenti testified that the passenger stuck a silver gun out of the window and fired two or three shots at Guardado and then drove off again. Guardado suffered gunshot wounds to his scrotum and left thigh. Guardado was unarmed and was not moving toward the car when he was shot. Vicenti testified that after the shooting Guardado stated, "The motherfuckers didn't hit me," then ran up the street to the Carlos Club.
>
> Guardado, an admitted alcoholic with a criminal record and a reputation for violent confrontations, testified he was also under the influence of alcohol during this incident. He admitted being a "mean drunk" and harboring anger toward Blacks. Due to his blackouts, he remembered nothing but the fact that he was shot. He told the police that he was unarmed but that his companion, Vicenti, may have had a knife. He also told the police that he becomes stupid and crazy when drinking and that the whole incident would not have happened had he not been drunk. He did recall going to the Carlos Club after the shooting.
>
> Guardado admitted lying to police officers on the way to the hospital when he told them he had an Uzi and had shot back at his attackers. He had made the false statement to show that he had fought back.
>
> A high speed chase ensued on city streets and onto Highway 280. Numerous officers in marked police cars joined in the pursuit, with

lights flashing and sirens wailing. The Buick failed to stop at traffic signals during the chase and swerved around a police car. The Buick began to smoke on the highway and the chase ended. Taylor and Spruill, the driver, were taken into custody. Taylor had to be forcibly removed from the Buick. No guns were found on Taylor or Spruill or in the car. At the police station, 25 grams of marijuana were found in Spruill's jacket.

While no gun was found at the scene of the shooting, a .357 magnum with four live rounds and one spent round was found on the chase route on Guerrero between 25th and 26th Streets. Taylor's fingerprint was on the gun and tests showed that the spent round had been fired from this .357 magnum.

Doctors Jack McAnich and Dana Fugelso performed surgery on Guardado after the shooting. The wound to Guardado's scrotum destroyed his right testicle and damaged his left testicle. Approximately 35 percent of his left testicle was reconstructed. As a result of his injuries, he is unable to have children and his hormone level is reduced, possibly affecting his male development and sexual function. The bullet had entered on the right side of the scrotum and ended up in Guardado's thigh, traveling a downward course.

Arthur Ortiz, testifying for Taylor, stated that Spruill picked him up in the Buick at his home one block away from the liquor store at Capp and 24th Streets. Someone named Charles was also in the car. Spruill parked at the nearby McDonald's and all three men got out. Guardado and Vicenti were there and Guardado and Charles got into an argument. Then Guardado began calling Spruill a "nigger" but Spruill ignored him. Spruill left to pick up Taylor from a Chinese restaurant.

Guardado continued to yell at Ortiz and Charles as they walked to the liquor store. He was acting crazy and yelling that they had come to his district, the Mission, and that he owned the Mission. Ortiz testified that Guardado was staggering and had a mean look in his eyes. He had seen Guardado act in this manner in the past.

Spruill and Taylor drove up to the store and Taylor called out for Ortiz to come up to the car. Guardado turned toward the car and started yelling at Taylor, "Come on, niggers, come on niggers." With his hands in his pockets, Guardado started staggering toward the car as he yelled the insults. Ortiz did not see Guardado with a knife, although he saw him pull something out of his pocket. Ortiz backed up further into the store. He had a feeling that something was going to happen. He heard the two gunshots, saw the Buick leave and another car chase it. Ortiz testified that Guardado was about five feet away from the car when he heard the shots.

    Taylor testified that after Spruill picked him up at a Mission District Chinese restaurant, they drove to the liquor store at Capp and 24th Streets.  Ortiz was in the store and Guardado was standing between the store's doorway and a light pole.  Taylor started to get out of the car as Guardado was backing out of the store.  When Guardado turned around, Taylor recognized him as someone who had once harassed him on Mission Street.  Additionally, a girlfriend had once warned him to stay away from Guardado and that he was tough.  Guardado looked drunk or high and he said "[I]t's two niggers. . . .  What the fuck you guys doing in my district?  Motherfucker, don't you know . . . . I kill you."

    Taylor carried a loaded .357 revolver with him for protection.  He had it in his belt.  He kept it loaded as he believed he needed protection after two of his friends were killed in 1987.  He bought the gun for $45 and thought it might be stolen.  Taylor had other guns before this one.  He testified that Spruill did not know he had the gun.

    Taylor pulled the gun out as he saw Guardado come toward the car with a knife in his had.  Guardado was within six or seven feet of the car and Taylor could not raise the power window as the motor was off.  He testified that he pulled out the gun to scare Guardado.  He pointed it at the ground and fired twice.

    Taylor pointed the gun downward at a 20 to 30 degree angle, aiming at the ground behind Guardado.  He admitted that the bullet would have to pass through Guardado's groin before hitting the ground and that Guardado was standing between the gun and the area at which he was aiming.  Because the gun had a large recoil, he had to bring his arm down and re-aim before he fired it again.

    When Taylor realized that the police were chasing them, he emptied the bullets and threw the gun out the window.  He was afraid the police would shoot him.

Answer, Ex. 3 at 2-7.

    Petitioner's fourth parole hearing was held on September 5, 2001.  Pet. at 6; Answer, Ex. 2.  Petitioner refused to appear at the hearing but was represented by counsel. Answer, Ex. 2 at 1-2.  The transcript of the Board of Prison Terms' decision to deny petitioner parole reads as follows, in a verbatim transcription:

    Okay.  The Panel reviewed all the information received from the public and relied on the following circumstances in concluding that that prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  The offense was carried out in an especially

cruel and callous manner. The offense was carried out in a dispassionate manner. The victim was abused or mutilated in that he was shot in the an area where his testicles or one testicle had to be removed and another one had to be partially removed because it was so severely damaged. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. The motive for the crime was inexplicable of very trivial in relationship to the offense. These conclusions was drawn from the Statement of Facts wherein on January 14th, 1989, two undercover officers observed Taylor lean out of his car and face the victim and two other males that was standing on the sidewalk and fire two shots at them. A chase ensued. Taylor was later apprehended and a gun was recovered, a .357 Magnum, and it was determined that Taylor's handprints or fingerprints was on the weapon and he was connected to the crime as the shooter and he was subsequently convicted of the crime. The prisoner has an escalating pattern of criminal conduct. He had an unstable history of tumultuous relationships with others. He failed previous grants of probation and parole and cannot be counted upon to avoid criminality. He failed to profit from society's previous attempts to correct this criminality. Such attempts included juvenile probation, juvenile camp, and juvenile parole. The prisoner has an unstable social history and prior criminality. The unstable history includes a lengthy juvenile record for the prisoner, who was removed from his home on several occasions, and made the ward of the court and placed in a different home. And when that failed, he was placed in a camp, then he was placed back in his home. And also an unstable social history, he has a lengthy history of possession of cocaine and substance abuse and for sale. Also, under prior criminality, the prisoner was arrested for such things as battery on a peace officer, burglary, possession of controlled substance for sale and battery, carrying a loaded firearm and of course, the instant offense. The prisoner has failed to demonstrate evidence of positive change. While incarcerated, misconduct while in prison includes most recently, three new CDC 115s and a total of . . . 13 115s since his incarceration and the most recent one was on 2/9/01 for refusing to comply with Penal Code 296. Then on 8/5/2000, disobeying orders. Then on 9/27/99, disobeying orders and that was reduced to a 128(a) and it's also noted that the prisoner received three 128 counseling chronos. The prisoner lacks realistic parole plans in that he does not have viable residential plans. He does have acceptable employment plans and he does not have a marketable skill. And it's also noted that while in a vocational program, computer repair, the prisoner has failed to complete that, he was removed from the class. There are no responses in terms of Penal Code 3042 Notices that were sent out. The Board makes the following findings. The prisoner needs therapy in order to face, discuss, understand and cope with stress in a non-destructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others. The prisoner's gains are recent and he must demonstrate the ability to maintain gains over

5

> an extended period of time. Nevertheless, the prisoner should be commended for the self-help programs that he participated in and the reading programs that he participated in. However, these positive aspects of his behavior does not outweigh the factors of unsuitability. Therefore, his parole is denied for two years.

Answer, Ex. 3 at 19-22. Petitioner challenged his 2001 denial of probation at all three levels of California's courts. The only court to issue a reasoned decision regarding petitioner's challenge was the Superior Court of Solano County. Answer, Ex. 5. That court found, in relevant part:

> Petitioner fails to demonstrate that the Board of Prison Terms acted arbitrarily and capriciously by not having any evidence to support its determination finding petitioner unsuitable for parole. (*In re Ramirez* (2001) 94 Cal. App.4th 549)

Id. at 2.

II. Habeas Corpus Standard

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA"). See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief). See also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore

/////

/////

6

did not address the merits of petitioner's Eighth Amendment claim).[1]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show that he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law if the state court simply fails to cite or fails indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth

---

[1] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

7

1  in the cases of the United States Supreme Court or whether an unreasonable application of such
2  law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court fails
3  to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional
4  or federal law, the Ninth Circuit has held that this court must perform an "independent review of
5  the record to ascertain whether the state court decision was objectively unreasonable. Himes v.
6  Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court
7  applied the correct law, and analyzes whether the decision of the state court was based on an
8  objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

III. Parole In California

In Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7, 11 (1979), the United States Supreme Court found that an inmate has "no constitutional or inherent right" to parole, even when a state establishes a system of conditional release from confinement. The Court recognized, however, that the structure of parole statutes might give rise to a liberty interest in parole that would, in turn, mean an inmate was entitled to certain procedural protections. Id. at 14-15. In Greenholtz, the Court found that the "mandatory language and structure of the Nebraska statute at issue" created such a liberty interest. Id. at 12; Board of Pardons v. Allen (Allen), 482 U.S. 369, 371 (1987).

In McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002), the Ninth Circuit used the Greenholtz-Allen framework to determine whether California statutes created a liberty interest in

/////
/////
/////
/////

parole. The critical statute at issue in McQuillion is California Penal Code section 3041, which provides in relevant part:

> (a) In the case of any prisoner sentenced pursuant to any provision of law, other than [the determinate sentencing law], the Board of Prison Terms shall meet with each such inmate during the third year of incarceration for the purposes of reviewing the inmate's file, making recommendations, and documenting activities and conduct pertinent to granting or withholding post-conviction credit. One year prior to the inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the Board of Prison Terms shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5.[2] The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime....
>
> (b) The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

The Ninth Circuit found that subdivision (b) was like the statutes in both Greenholtz and Allen:

> California's parole scheme gives rise to a cognizable liberty interest in release on parole. The scheme "'creates a presumption that parole release will be granted'" unless the statutorily defined determinations are made.

McQuillion, 306 F.3d at 901-02. Again in Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003), the Court of Appeals reiterated its holding that the California parole scheme created a liberty interest in parole, noting that "California Penal Code § 3041(b) controls" the resolution of the question because its "language clearly parallels the language" under consideration in Greenholtz

---

[2] California Penal Code § 3041.5 establishes procedural requirements for Board hearings.

9

1  and Allen.  See also In re Rosenkrantz, 29 Cal.4th 616, 654 (2002) (in discussing § 3041(b), the
2  California Supreme Court noted "parole applicants . . . have an expectation that they will be
3  granted parole unless the Board finds . . . that they are unsuitable in light of the circumstances
4  specified by statute and regulation").
5        The existence of a liberty interest means that a decision to deny parole must be
6  supported by some evidence and not be otherwise arbitrary.  Superintendent, Massachusetts
7  Correctional Institute, Walpole v. Hill, 472 U.S. 445, 457 (1985); Jancsek v. Oregon Board of
8  Parole, 833 F.2d 1389, 1390 (9th Cir. 1987).  The test is "not whether some evidence supports
9  the *reasons* . . . for denying parole, but whether some evidence indicates a parolee's release
10  unreasonably endangers public safety."  In re Lee, 143 Cal.App.4th 1400, 1408 (2006) (emphasis
11  in original).  The evidence must have some indicia of reliability.  Biggs, 334 F.3d at 915.  The
12  "some evidence" requirement is a "minimally stringent" standard and does not require the court
13  to reweigh the evidence or examine the entire record.  Powell v. Gomez, 33 F.3d 39, 40 (9th Cir.
14  1994); Hill, 472 U.S. at 455-56.

> [The] analysis is framed by the statutes and regulations governing parole suitability determinations . . . . [W]e must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" . . . constituted an unreasonable application of the "some evidence standard" principle articulated in *Hill*.

20  Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007), as amended, ___ F. 3d ___ (9th Cir. July 13,
21  2007).
22  /////
23  /////
24  /////
25  /////
26  /////

The Board's regulations for setting parole release dates are found in title 15 of the California Code of Regulations. Section 2401 of this title provides:

> A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing scheduled as provided in Section 2268. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.
>
> In setting the parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation.
>
> The terms in this article are guidelines only. The suggested terms serve as the starting point for the board's consideration of each case on an individual basis. The board may establish a term above or below the guidelines when warranted and reasons are stated on the record. A prisoner shall not be released before the minimum eligible parole date.

15 Cal. Code Regs. § 2401.

Section 2402 provides:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the

/////

prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the

        importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

        (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

        (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

        (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

        (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

        (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

        (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

        (7) Age. The prisoner's present age reduces the probability of recidivism.

        (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

        (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

15 Cal. Code Regs. § 2402.

        Once the Board determines that an inmate is suitable for parole, it proceeds to set a date for the inmate's release, based on numerous factors provided in sections 2403 through 2411. The paramount concern in determining parole suitability is public safety. In re Dannenberg, 34 Cal.4th 1061, 1080, 1084, 1085, 1086, cert. denied, 546 U.S. 844 (2005) ("the overriding statutory concern" is for public safety; purpose of the statutes is to "guarantee that the

Board has fully addressed the public safety implications" of the release determination).

III. <u>Some Evidence</u>

As outlined above, petitioner has a protected liberty interest in parole unless there is "some evidence" in the record to support the proposition that petitioner's release unreasonably endangers public safety. The court finds that there is some evidence to support that proposition in this case.

The Board is correct that the victim was mutilated, given the nature of his permanent injuries. Also, the motive for petitioner's offense was very trivial. While there was some provocation, petitioner's shooting Guardado was an unnecessary escalation of the conflict. Petitioner, who was in a car, could easily have left the scene of the conflict unharmed. Cf. <u>In re Scott</u>, 119 Cal.App.4th 871, 892-93 (2004) ("reference in Board regulations to motives that are 'very trivial in relationship to the offense' requires comparisons; to fit the regulatory description, the motive must be materially less significant . . . than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released").

Petitioner's criminal history combined with his prison record also support the conclusion that petitioner's release at this time poses a risk of danger to the public. <u>In re Lee</u>, 143 Cal.App.4th 1400, 1409 (2006) (criminal record properly viewed "within the context of the other factors [the panel] must consider to see if some evidence shows [the inmate] continues to pose an unreasonable risk to public safety" ). Petitioner committed the present offense when he was 18. <u>See</u>, <u>e.g.</u>, Pet. at 33. Prior to the offense, petitioner had committed, among other things, the crimes of battery on a peace officer, burglary and carrying a loaded firearm. Answer, Ex. 2 at 7:20-8:12. At the time of his 2001 parole hearing, petitioner was 30; while it is reasonable to expect that he would make better decisions with age, petitioner has not performed well in prison. He has been found guilty of numerous infractions, including refusal to provide DNA samples as required under California law, refusal to be locked in his cell (multiple times), being in an

1  unauthorized place within the prison, refusing to end a phone call despite being ordered to do so,
2  failing to report for a job assignment, delaying an officer by failing to return a food tray and
3  possession of unissued property.  Answer at 9:25-12:10.  Petitioner's infractions demonstrate a
4  continuing lack of maturity thereby precluding a determination that his prior criminal acts were
5  mere mistakes of his youth.
6        Not all of the findings made by the Board are supported by the record.
7  Petitioner's offense was not dispassionate[3] as there was evidence before the Board that there was
8  some level of provocation for petitioner's firing upon Guardado.  Moreover, the offense was far
9  from the "execution-style murder" used as an example in the regulations.  Petitioner's offense
10 cannot be described as "especially cruel and callous," and the offense was not carried out in a
11 manner that demonstrated callous disregard for human suffering, as would torture.  Cf. In re
12 Weider, 145 Cal. App. 4th 570, 589 (2006) ("initial wounding and deliberate stalking of a
13 defenseless victim[]  reasonably [] characterized as especially cruel and callous").
14       Additionally, the court's determination expressly does not approve the Board's
15 decision in a different respect.  At the hearing, the Board commented on the pre-hearing
16 psychological evaluation conducted by Dr. Dean Clair:

> Dr. Clair says that Mr. Taylor poses an unpredictable degree of
> dangerousness.  His precise words were that "he's unable to predict
> the degree of dangerousness," I believe.  He also speaks to the
> recent disciplinaries and writes that "they reflect a certain potential
> for rebelliousness."

20 Answer, Ex. 2 at 14:22-15:1.  The Board misquotes and mis-characterizes Dr. Clair's report.
21 While Clair acknowledges it is difficult to predict whether petitioner will be dangerous, he
22 actually does so by saying that in his opinion petitioner is "no longer 'dangerous.'"  Clair also
23 /////

---

[3] "Dispassionate" means "free from or unaffected by passion; devoid of personal feeling or bias; impartial; calm"; "calculated," also used in the regulation, means "carefully thought out or planned."  See www.dictionary.com <accessed 8/30/07>.

said, "petitioner's recent disciplinary writeups reflected a certain potential for rebelliousness, but fell well short of any potential violence." Pet. at 62 (Ex. J at 3).

That some of the Board's conclusions are not supported by the record, however, does not undermine this court's finding there is some evidence in the record to support the 2001 determination that petitioner's release at that time would have unreasonably endangered public safety. Further, the Superior Court of Solano County's finding that petitioner failed to show the 2001 decision to deny parole was not supported by evidence is not contrary to, nor did it involve an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States and is not based on an unreasonable determination of the facts in light of the evidence presented.

IV. <u>Other Claims</u>

Petitioner argues that the California Board of Prison Terms has a policy of denying parole to all inmates. Pet. at 6. However, petitioner fails to present any evidence in support of this contention. This claim should be denied. To the extent petitioner raises other claims in his application for writ of habeas corpus, those claims are not cognizable in this 28 U.S.C. § 2254 action.

V. <u>Conclusion</u>

For all the foregoing reasons, the court will recommend that petitioner's application for writ of habeas corpus be denied. In light of the foregoing, the court need not address respondent's argument that petitioner failed to exhaust state court remedies with respect to some of his claims prior to filing suit. 28 U.S.C. § 2254(b)(2) (habeas petition may be denied on the merits without exhaustion of state court remedies).

In accordance with the above, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be denied.

/////

/////

1   These findings and recommendations are submitted to the United States District
2   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty
3   days after being served with these findings and recommendations, any party may file written
4   objections with the court and serve a copy on all parties.  Such a document should be captioned
5   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
6   shall be served and filed within ten days after service of the objections.  The parties are advised
7   that failure to file objections within the specified time may waive the right to appeal the District
8   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 30, 2007.

_____
U.S. MAGISTRATE JUDGE

1
tayl0981.157